IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 17-CV-00372-WYD-GPG

STEPHEN CENTOFANTI,

Plaintiff,

v.

BRIAN EVANS,
TACTICAL ADVANTAGE, INC., a Wyoming corporation
RAYMOND MEZE DAVOUDI, an individual
MOMENTUM FOUNDATION, a Tennessee corporation
XP SERVICES, INC., a Tennessee corporation
COASTAL DEFENSE, INC., a Pennsylvania corporation

Defendants.

_____

**PLAINTIFF'S MOTION FOR LEAVE TO AMEND COMPLAIN TO SEEK EXEMPLARY DAMAGES AGAINST DEFENDANT BRIAN EVANS**
_____

Plaintiff Stephen Centofanti, through counsel Ogborn Mihm, LLP, and Feldman & Wertz, LLP, respectfully submit the following Motion for Leave to Amend Complaint to Seek Exemplary Damages Against Defendant Brian Evans and in support thereof states:

**Statement of Conferral Pursuant to Local Rules:** Counsel for Centofanti conferred with counsel for Defendant Evans – the subject of the relief sought herein – on the subject of this motion. The facts and legal arguments are well known to the parties. Counsel for Evans has indicated that they will oppose the relief sought herein.

### I. INTRODUCTION

On May 28, 2015 Defendant Brian Evans ("Evans"), an experienced ex-military aviator, piloted a 1980's era Czech fighter trainer jet called a Vodochody L-39 Albatross ("L-39") for Coastal Defense, Inc., ("Coastal Defense") a civilian entity that provides military training to the

US Armed Forces. Coastal directed Evans to fly the L-39 from Grand Junction, Colorado to Gadsen, Alabama where the L-39 was to undergo repairs to multiple aviation systems.

Immediately after takeoff from Grand Junction, Evans deviated from his flight plan and decided to fly a high speed (+ 300 mph), and ultra-low altitude route a few yards above the Colorado River and directly next to Interstate I-70 through the DeBeque Canyon. The purpose of this outrageous decision was apparently to entertain the unauthorized civilian passenger Evans invited to ride along in the L-39 that day. In so doing, Evans struck a group of power lines strung across the Colorado River on seventy foot towers. The impact severed those power lines (along with multiple parts of the L-39), which then bull-whipped across I-70 striking Plaintiff Centofanti's vehicle causing injuries to Centofanti in the process. In all candor, one would be hard-pressed to think up a set of facts more definitively descriptive of the willful and wanton disregard for the safety of others.

Given the prima facie evidence (more specifically set out below) showing that Defendant Evans acted with willful and wanton disregard for the safety of Centofanti, coupled with the lenient standard in Colorado for amending a complaint to assert exemplary damages, Centofanti should be granted leave to amend his Complaint to include factual allegations of willful and wanton conduct and to add a prayer for punitive damages.

## II. BACKGROUND

Defendant Evans is a marine, F-18 trained pilot who flew close air support (CAS) missions in the military. (*See* **Ex. 1**, Evans Dep. at 9:1-12:19.) CAS is the employment of ordnance in close proximity to troops, which requires an experienced pilot proficient with tactical, low-level, high-speed flying all the while communicating with ground troops to insure accuracy and the protection of friendly forces. (*Id.* at 32:4-22, 34:7-23.) During his twenty-year

tenure in the Marines, Evans spent time as a safety officer and operations officer, working his way up through multiple promotions in his Marine career to a "schoolhouse director" for the Tactical Air Control school that trains and certifies joint terminal attack controllers (JTACs) and forward air controllers (FACs), who provide guidance to CAS aircraft. (*Id.* at 12:5-16:16.) In short, Evans is about as highly trained as a CAS pilot could ever be.

After retiring from the military, Evans went to work for multiple civilian government contractors including Defendant Coastal Defense, where his job responsibilities were piloting Coastal Defense's L-39 airplanes. (*Id.* at 28:12-20; *see also* **Ex. 2**, Coastal Defense Rule 30(b)(6) Dep. at 46:3-13.) Coastal Defense contracted with the government to assist in training military troops by providing CAS pilots and aircraft to simulate close air support missions, as well as simulate intelligence, surveillance, and reconnaissance missions. (*See* **Ex. 2** at 23:3-24:25.)

In May of 2015, after a Coastal Defense contract project near Boise, Idaho was cancelled due to bad weather, Coastal Defense hired Evans to deliver Coastal Defense's L-39 airplane from Boise, Idaho to Gadsden, Alabama, where Coastal Defense's lead aircraft mechanic was stationed. (*See* **Ex. 1** at 72:6-8, 73:7-21.) After Evans was given this directive, he realized he had an opportunity to fly the L-39 alone. Consequently, Evans called a buddy of his who expressed interest in flying in a high-performance aircraft and invited him to ride along on the flight. (*Id.* at 73:7-11, 78:16-22.) The two took off in the L-39 from Boise on May 27, 2015 headed first to Grand Junction for a scheduled layover. In that first leg, Evans performed low-level flying exercises at high speed just outside of the Boise airport area showing off to his friend in the aircraft. (*Id.* at 81:4-82:23, 86:4-15.)

On May 28, upon leaving Grand Junction after the layover, Evans made the same decision again. He decided to alter the planned flight path to perform high-speed, very low

3

altitude, CAS type aviation through DeBeque Canyon mere yards above the Colorado River and directly adjacent to Interstate 70. There was absolutely no need for this flight plan; it was purely for Evans' own self-perceived benefit and enjoyment. Even more, before Evans made this decision, he decided to forgo studying any VFR maps or even conduct the most basic of research into any potential obstacles on the flight path, and in fact, he did not even have any planned flight route in mind as he took off. (*Id.* at 96:18-97:12, 116:14-17.) To recap, Evans piloted a high-performance fighter jet in need of maintenance, with his buddy in the back seat at estimated speeds in excess of 300 knots at treetop level adjacent to the major interstate in Colorado without any flight planning. (*Id.* at 106:10-25, 137:1-12.) Evans evaluated these risks and thought it was no big deal. Moreover, Evans was aware of the highway next to him, and he knew that there were cars on the highway before he flew even lower and faster. (*Id.* at 104:9-13.) Understandably, at those speeds Evans did not see the power lines until a split second before he hit them. (*Id.* at 107:1-14.)

Evans made these purposeful decisions to fly in the blind in direct proximity to people and vehicles on the ground despite testifying that he was well-aware from the start that there was an inherent risk any time a pilot conducts low-level flying. (*Id.* at 50:20-22.)

The impact of the aircraft with the power lines caused the wires to sever and then whip across I-70 striking Centofanti's vehicle. Additionally, multiple parts of the L-39 were torn off the plane and narrowly missed falling on other vehicles on I-70. Evans apparently concedes in afterthought that he should not have flown at such low altitudes, particularly in close proximity to the power lines. (*Id.* at 121:4-14.) In so doing, he concedes that the lower you are in altitude, the faster the speed feels. (*Id.* at 132:8-133:3.). He concedes that the there was a higher risk of

4

harm to people on the ground when flying so low next to a highway. (*Id.* at 141:4-15.[1]) He also concedes that he was not on a CAS flight or a mission flight at the time of this incident which would require him to fly in such a dangerous manner. (*Id.* at 153:12-14.). Evans also concedes that the incident was entirely his fault and believes that the culture, or "command climate," of Coastal Defense permitted such conduct. (*Id.* at 130:8-131:7.)

Ferry flights (transporting an aircraft from one location to another) do not typically involve carrying civilian passengers, nor do they involve low altitude flying. (*Id.* at 160:7-16.) Evans was, in fact, grossly in violation of Federal Aviation Regulations that prohibited an aircraft from flying any closer than 500 feet from a person, vehicle or structure. (*See* **Ex. 1** at 165:5-13.) Coastal Defense, who directed Defendant Evans to ferry the aircraft that day, considered the conduct to be a "bad decision." (*See* **Ex. 2** at 131:5-13, 133:9-11, 135:15-23.) Even more, Coastal Defense considered the conduct to create an even higher degree of risk than the already increased risk recognized by Evans. (*Id.* at 135:24-136:4.) Coastal Defense, Evans' own employer, considered the conduct to be dangerous. (*Id.* at 143:10-144:1.)

### III. LEGAL AUTHORITY

*A.     Applicable Law*

It is a long-recognized principle that, in accordance with the Erie doctrine, federal courts sitting in diversity apply state substantive law and federal procedural law. *Racher v. Westlake Nursing Home Ltd. P'ship*, 871 F.3d 1152, 1162 (10th Cir. 2017).

*B.     Federal Procedural Law Governing Motions to Amend*

F.R.C.P. Rule 15(a)(2) provides that a party may amend its pleading only with the court's leave and that the court should freely give leave when justice so requires. A court has discretion

---

[1] An "MOA," as referenced in Defendant Evans testimony, is a designated military operation area. (Coastal Defense Rule 30(b)(6) Dep. 99:6-18.)

whether to grant a motion seeking leave to amend. *Midcities Metro. Dist. No. 1 v. U.S. Bank Nat'l Ass'n*, 44 F. Supp. 3d 1062, 1065 (D. Colo. 2014); *Anderson v. Merrill Lynch Pierce Fenner & Smith Inc.*, 521 F.3d 1278, 1288 (10th Cir. 2008). Factors to consider when ruling on a motion to amend include undue delay, undue prejudice to the opposing party, bad faith or dilatory motive, failure to cure deficiencies by previously allowed amendments, or futility of the amendment. In the absence of any of these factors, the leave sought should be freely given, as the rule contemplates. *Id.* at 166 (*citing Frank v. U.S. West, Inc.*, 3 F.3d 1357, 1365 (10th Cir. 1993)); Forman v. Davis, 371 U.S. 178 (1962). "If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, [the plaintiff] ought to be afforded an opportunity to test his claim on the merits." *Forman*, 371 U.S. 178 at 182.

While exemplary damages do not constitute an independent claim for relief, a party may move the court to amend the complaint to add factual allegations of willful and wanton misconduct and to add to the prayer for relief a request for the award of exemplary damages. *See Fernandez v. Bridgestone/Firestone, Inc.*, 105 F. Supp. 2d 1194, 1196 (D. Colo. 2000).

C.     *State Substantive Law Governing Exemplary Damages*

Pursuant to C.R.S. § 13–21–102, inclusion of a claim for exemplary damages is prohibited in the initial pleading and only allowed after the plaintiff establishes prima facie proof of a triable issue. C.R.S. § 13–21–102(1.5)(a). This statute contemplates that the discovery process will provide the requisite prima facie evidence to support a claim for exemplary damages. *See Stamp v. Vail Corp.*, 172 P.3d 437, 449 (Colo. 2007).

"Prima facie evidence is evidence that, unless rebutted, is sufficient to establish a fact." *Stamp v. Vail Corp.*, 172 P.3d 437, 449 (Colo. 2007). In order to meet the burden of establishing a prima facie case of a triable issue on liability for exemplary damages, a plaintiff need only "establish prima facie proof of willful and wanton conduct, not" "willful and wanton conduct

beyond a reasonable doubt." *Id.* at 450; *see also Am. Econ. Ins. Co. v. William Schoolcraft*, No. 05–cv–01870–LTB–BNB, 2007 WL 160951, at *4 (D. Colo. Jan. 17, 2007) (emphasizing that in resolving request to amend pursuant to C.R.S. § 13–21–102, court should consider only the "preliminary question" of whether moving parties made prima facie case, not whether any party will ultimately be entitled to those damages). "The existence of a triable issue on liability for punitive damages is established by a showing of a reasonable likelihood that the issue will ultimately be submitted to the jury for resolution." *Leidholt v. Dist. Court In & For City & Cty. of Denver*, 619 P.2d 768, 771 n.3 (Colo. 1980). "This is a lenient standard. A plaintiff should have an opportunity to test the merits of any claim for relief that is supported by the underlying facts of the case." *Stamp*, 172 P.3d at 450.

C.R.S. §13-21-102(1)(a) provides for an award of exemplary damages where an injury to the person or to personal or real property "is attended by circumstances of fraud, malice, or willful and wanton conduct." For purposes of this statute, "'Willful and wanton conduct' means conduct purposefully committed which the actor must have realized as dangerous, done heedlessly and recklessly, without regard to consequences, or of the rights and safety of others, particularly the plaintiff." C.R.S. § 13-21-102(1)(b). "Where the defendant is conscious of his conduct and the existing conditions and knew or should have known that injury would result, the statutory requirements of section 13–21–102 are met." *Coors v. Sec. Life of Denver Ins. Co.*, 112 P.3d 59, 66 (Colo. 2005).

### IV. ARGUMENT

#### A.   *Plaintiff's Motion to Amend is proper and timely.*

Centofanti timely seeks leave to amend his Complaint to assert facts related to Evans' willful and wanton conduct and to include a prayer for exemplary damages.

More specifically, the parties to this action just completed key depositions in February of 2018, including those of Evans and Coastal Defense, both of which are pertinent to the underlying facts supporting the request to pursue exemplary damages. Thus, there was no undue delay in filing this motion. To the contrary, Centofanti seeks to timely amend now that written discovery to and depositions of the Defendants have largely been completed, though discovery cut-off is not until June 1, 2018. All parties have the same information and have had the same opportunity to discover facts relevant to Centofanti's request to seek exemplary damages, and in fact, Defendants were, and are, in a better position to address the evidence related to Evans' conduct. Additionally, Centofanti requires no additional discovery in relation to his prayer for exemplary damages, so no defendant can justifiably argue that they will suffer undue prejudice. Moreover, an amendment for exemplary damages will not delay in the case in any respect. Presently the Court is reviewing a motion for summary judgment and no trial dates have been set. Just knowing the general story about what happened on May 28, 2015 should be enough for the Court to conclude exemplary damages are warranted. Despite that, the facts set forth herein establish more than enough evidence of sufficient willful and wanton conduct, such that this motion is not futile and illustrates Centofanti is not filing this motion in bad faith or for dilatory motive. Finally, Centofanti has not sought any prior amendments. Given the absence of prohibitive factors and proof of the required prima facie evidence set forth herein, this Court should grant Centofanti's Motion for Leave to Amend.

### B.   *Defendant Evans' conduct was willful and wanton.*

Prima facie evidence exists to prove that Defendant Evans' conduct was willful and wanton, and this Court should grant Plaintiff's motion.

Defendant Evans, a veteran military pilot with extensive tactical aviation experience and safety training, decided to fly the L-39 at extremely low altitudes and extremely high-speed

basically right above an inter-continental highway.  Evans knew that there was an inherent risk in flying aircraft in a tactical manner, particularly in close proximity to people, and that the risk was exacerbated exponentially by very low-altitude flying.  Despite this knowledge, Evans decided to pilot the jet at a high speed right next to I-70 at low levels with full knowledge of vehicles and people on the road.  More so, he did so without having any specific flight plan or even conducting an investigation into the terrain and potential obstacles beforehand.  It should not be lost on any of the parties to this case or this Court that Evans' conduct could have easily resulted in multiple fatalities.

Evans' conduct was purposefully committed wherein he must have—and did—realize the conduct was dangerous, but still heedlessly and recklessly took such action without regard to the consequences or rights and safety of those on I-70, particularly Centofanti, who was on his way to a camping trip with his friends when Evans' airshow ran right into him.  As a result, Evans' aircraft struck power lines, sending electrical wires and debris tearing across I-70, which struck Centofanti's car and significantly injured Centofanti in the process.  Evans concedes his own reckless behavior, and the evidence shows that he was in violation of multiple FAA regulations at the time of the incident.  Even more, Coastal Defense, the employer that employed Evans to conduct this flight, concedes that his conduct increased the risk of harm to others and was nothing short of dangerous.  Defendant Evans was fully aware of the risk of harm, his conduct, and the existing conditions, but ignored all of it for the purposes of either showing off to his buddy or honing his CAS skills in an area obviously not cleared for such training.

Defendant Evans' conduct was willful and wanton, and Plaintiff has provided prima facie evidence of that conduct such that this Court should grant him leave to amend to assert such facts and include a prayer for exemplary damages.

## V. CONCLUSION

Based on the record before the Court, there is sufficient evidence from which a jury could (and likely will) conclude that Evans acted willfully and wantonly. He ignored his safety training and the known inherent risks in low-altitude flying, violated FAA regulations, and conducted a flight at extreme speeds and low levels mere yards from I-70. Evans made the conscious choice to disregard hazards of which he knew, knowing that his decisions exposed people, including Mr. Centofanti, to an increased risk of significant injury or death. Under the lenient standard articulated by the Supreme Court in *Stamp*, Plaintiffs have carried their burden of making out a prima facie case for allowing a jury to consider the issue of exemplary damages.

WHEREFORE, Plaintiff Centofanti respectfully requests that this Court grant this motion and allow Mr. Centofanti leave to amend his Complaint adding a prayer seeking exemplary damages against Defendant Evans.

Respectfully submitted this 18th day of May, 2018.

S/Alan Feldman, #31737

Feldman & Wertz, LLP
215 South Monarch St. Suite 303
Aspen, CO 81611
Tel: 970-925-1025
E-Mail: alan@aspen-law.com

S/*Mike Ogborn*

Michael J. Ogborn, Atty. Reg. No. 20932
Ogborn Mihm, LLP
1700 Broadway, Suite 1900
Denver, Colorado 80290
Phone: 303.592.5900
Email: mike.ogborn@omtrial.com

## CERTIFICATE OF SERVICE

I hereby certify that on May 18, 2018, a true and correct copy of the foregoing **PLAINTIFF'S MOTION FOR LEAVE TO AMEND COMPLAIN TO SEEK EXEMPLARY DAMAGES AGAINST DEFENDANT BRIAN EVANS** was filed electronically with the Court via CM/ECF and served upon the following:

Brett M. Godfrey
Joshua K. Smith
GODFREY JOHNSON
9557 S. Kingston Court
Englewood, Colorado 80112
Email: godfrey@gojolaw.com; smith@gojolaw.com
*Attorneys for Defendants Brian Evans and Tactical Advantage, Inc.*

Robert J. Zavaglia, Jr.
Kathleen J. Johnson
TREECE ALFREY MUSAT P.C.
633 17th Street, Suite 2200
Denver, CO 80202
Email: zavaglia@tamlegal.com; kjohnson@tamlegal.com
*Attorneys for Momentum Foundation, Inc.; XP Services, Inc.; and Coastal Defense, Inc.*

*S/ Alan Feldman*

_____

Alan Feldman