IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Senior Judge Wiley Y. Daniel**

Civil Action No.   17-cv-00372-WYD-GPG

STEPHEN CENTOFANTI,

    Plaintiff,

v.

BRIAN EVANS, an individual,
TACTICAL ADVANTAGE, INC., a Wyoming corporation,
MOMENTUM FOUNDATION, INC., a Tennessee corporation,
XP SERVICES, INC., a Tennessee corporation,
COASTAL DEFENSE, INC., a Pennsylvania corporation,

    Defendants.

---

**ORDER ON DISPOSITIVE MOTIONS**
---

I.    <u>INTRODUCTION</u>

This matter comes before the Court on the Motion for Summary Judgment filed by Coastal Defense, Inc. ["CDI"], Momentum Foundation, Inc. ["Momentum"] and XP Services, Inc. ["XP"] on December 31, 2017; and (2) Momentum and XP's Fed. R. Civ. P. 12(c) Motion to Dismiss, or in the Alternative, Fed. R. Civ. P. 56 Motion for Summary Judgment filed May 31, 2018.  As to the latter motion, I ruled in an Order of June 5, 2018 (ECF No. 88), that the motion would be considered and decided under Rule 12(c) and not under Rule 56.  Both motions are fully briefed.

By way of background, this case arises as a result of an experimental classified fighter jet piloted by Brian Evans ["Evans"] flying less than 100 feet off the ground in the I-70 corridor and striking several power lines.  The jet is alleged to be a two-seat Aero

Vodochody L39 fighter trainer jet ("hereinafter "aircraft" or "L39") (Am. Compl., ECF No. 98, ¶ 10).[1] The power lines struck several vehicles, including Plaintiff's vehicle, allegedly causing Plaintiff injuries and damages. Plaintiff filed his action against Evans as well as Tactical Advantage, Inc. ["Tactical Advantage"], a corporation that Evans allegedly conducts his individual business through; Momentum and XP, alleged owners of the aircraft; and CDI, a corporation that Plaintiff alleges employs Evans. (*See id.* ¶¶ 3, 5-7.)[2]

Defendants Momentum, XP, and CDI [collectively "CDI Defendants"] seek summary judgment on the claims asserted against them; namely, Plaintiff's fifth claim of strict liability for distress asserted against all Defendants and sixth claim of respondeat superior asserted against CDI and Tactical Advantage. Momentum and XP, the owners of the aircraft, also seek dismissal of the claims against them pursuant to preemption under 49 U.S.C. § 44112(b) because Plaintiff did not sufficiently plead that they had control or possession of the aircraft. I discuss the facts relevant to the pertinent motions in my analysis of such claims.

II.  ANALYSIS

   A.  Rule 12(c) Motion to Dismiss

A motion for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c) is treated as a motion to dismiss under Fed. R. Civ. P. 12(b)(6). *Atlantic Richfield Co. v.*

---

[1] Although the Amended Complaint was filed on June 26, 2018, after the instant motions were filed, it does not impact the motions' merits as the Amended Complaint simply added an exemplary damages claim against Brian Evans, who is not a party to the motions.

[2] Plaintiff previously dismissed claims against Raymond Meze Davoudi, the alleged passenger of the aircraft.

*Farm Credit Bank of Wichita*, 226 F.3d 1138, 1160 (10th Cir. 2000). In reviewing a Rule 12(b)(6) motion, the court must "accept all well-pleaded facts as true and view them in the light most favorable to the plaintiff." *Jordan-Arapahoe, LLP v. Bd. of Cnty. Comm'rs of Cnty. of Arapahoe*, 633 F.3d 1022, 1025 (10th Cir. 2011). To survive such a motion, "a plaintiff must allege that 'enough factual matter, taken as true, [makes] his claim for relief ... plausible on its face.'" *Id.* (quotation and internal quotation marks omitted).

Plaintiff's sole claim against Momentum and XP is the claim for "Strict Liability Distress." In support of this claim, Plaintiff alleges that as the owners of the aircraft who permitted or consented to Evans' aircraft operation, they are strictly liable for any damages caused by Evans. Momentum and XP assert that Plaintiff did not allege that they had control or possession of the aircraft at the time of the incident, and that Plaintiff's claim must be dismissed as preempted by 49 U.S.C. § 44112(b) of the Federal Aviation Act.

That statute, entitled "Limitation of Liability", states in pertinent part:

(b) Liability. – A lessor, owner, or secured party is liable for personal injury, death, or property loss or damage on land or water only when a civil aircraft, aircraft engine, or propeller is in the actual possession or control of the lessor, owner, or secured party, and the personal injury, death, or property loss or damage occurs because of –

   (1) the aircraft, engine, or propeller; or

   (2) the flight of, or an object falling from, the aircraft, engine, or propeller.

49 U.S.C. § 44112(b). An "owner" is defined under the statute to "mean[] a person that owns a civil aircraft, aircraft engine, or propeller". 49 U.S.C. § 44112(a)(2).

The federal limitation on a civil aircraft lessor's, owner's, or secured party's liability set forth in 49 U.S.C. § 44112(b), and its predecessor 49 U.S.C. § 1404, has been held to preempt and/or bar a plaintiff's state law claims for wrongful death, personal injuries, or property damage against the aircraft lessor, owner, or secured party when the aircraft was not in their actual possession or control at the time of the occurrence.  *Matei v. Cessna Aircraft Co.*, 35 F.3d 1142, 1144-46 (7th Cir. 1994); *McCord v. Dixie Aviation Corp.*, 450 F.2d 1129, 1130 (10th Cir. 1971); *Rogers v. Ray Gardner Flying Service, Inc.*, 435 F.2d 1389, 1394 (5th Cir. 1970); *Esheva v. Siberia Airlines*, 499 F. Supp. 2d 493, 499 n.4 (S.D.N.Y. 2007); *In re Lawrence W. Inlow Accident Litigation*, No. IP 99-0830-C H/G, 2001 WL 331625, at *14 (S.D. Ind. Feb. 7, 2001); *Rosdail v. Western Aviation, Inc.*, 297 F. Supp. 681, 685 (D. Colo. 1969). Plaintiff does not contest this.

Plaintiff argues, however, that the Amended Complaint sufficiently alleges that Momentum and XP, as owners of the aircraft, were in control of the aircraft at the time of the occurrence.  The relevant allegations against Momentum and XP are as follow:

> 70. Tactical Advantage, Inc., Coastal Defense, Inc., XP Services, Inc. and Momentum Foundation, Inc. all either consented to or permitted Evans and Davoudi to operate the Vodochody on May 28, 2015 when the events forming the basis of this Complaint occurred.
> 
> * * *
> 
> 78. As owners who consented to Evans and Davoudi's operation of the Vodochody on May 28, 2015, XP Services, Inc. and Momentum Foundation, Inc. are strictly liable for Centofanti's damages.

There are undisputedly no allegations that Momentum or XP were in actual possession or control of the aircraft at issue.  Plaintiff argues, however, that under Fed.

R. Civ. P. 8, a plaintiff only has to plead "factual content that allows the court to draw a reasonable inference that the defendant is liable for the misconduct alleged." *George v. Urban Settlement Servs.*, 833 F.3d at 1247 (10th Cir. 2016). In this case, Plaintiff pled that Momentum and XP were owners of the airplane, permitted Evans to pilot the airplane on May 28, 2015, and consented to that flight. He argues that this sufficiently implies that Momentum and XP had possession or control over the aircraft.

I reject Plaintiff's argument and find that Momentum and XP's motion to dismiss must be granted. Plaintiff's allegations that the owners consented to the use of the plane are inadequate to establish that Momentum or XP exercised actual control over the aircraft at the time of the incident as required by 49 U.S.C. § 44112(b). Plaintiff alleges that Evans operated the aircraft through his corporate entity and pursuant to employment or contract with CDI. (Am. Compl. ¶¶ 66-68.) There are no allegations that Evans had any relationship with XP or Momentum, or that they did or even could control any operation of the aircraft. While Plaintiff argues that ". . . without permission from Momentum and XP the flight by Evans could not have taken place" (Pl.'s Resp. to Defs.' F.R.C.P. Rule 12(c) Mot. to Dismiss at 6), again this does not establish that Momentum/XP actually controlled the aircraft in any manner. Factual allegations must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted).

Tenth Circuit law supports the conclusion that mere consent does not constitute actual control over an aircraft. In the *McCord* case, the plaintiffs filed suit against owners and fixed base operators ["FBOs"] that rented an airplane to an allegedly

negligent pilot who crashed the plane. 450 F.2d at 1129-30. The plaintiffs attempted to impute the liability of the negligence of the pilot to the owners/FBOs. As in this case, the plaintiffs did not allege that the owners/FBOs exercised any control over the operation of the plane, nor did they allege any active negligence on their part or an agency relationship. *Id.* at 1130. In declining to find a claim against the owners/FBOs, the Tenth Circuit stated that "if Congress had intended to impose strict liability on an owner-bailor, it was capable of clearly and directly so providing." *Id.* at 1131.

Although *McCord* did not directly address the statute at issue here, it is nonetheless instructive as it expressly rejected the rationale that an owner is liable for the conduct of one to whom he entrusts an airplane, regardless of the degree of control. 450 F.2d at 1130. I agree with that rationale; otherwise, an owner would be liable for the aircraft operator's conduct unless the owner could show that the use of the plane was somehow unauthorized. I find that defeats the purpose of the statute.

Thus, 49 U.S.C. § 44112, which was first enacted as Section 504 of the Civil Aeronautics Act, was passed "in order to allow owners and lessors of aircraft to be shielded from liability when they were not in actual possession or control of the operation of the aircraft." *Escobar v. Nevada Helicopter Leasing LLC*, No. 13-00598 HG-RLP, 2016 WL 3962805, at *7 (D. Haw. July 21, 2016). It was enacted in direct response to the Uniform Aeronautics Act that had declared that the owner of every aircraft was "absolutely" liable for injuries, regardless of the owner's degree of control of the aircraft. *Id.* (citing H.R. Rep. No. 80-2091, at 1 (1948), reprinted in 1948 U.S.C.C.A.N. 1836). Allowing an owner to be liable without any assertion of actual

control of the operation of or possession of the aircraft would defeat that purpose. And in order to be in "actual possession or control", the *Escobar* court noted that "the owner/lessor must be 'engaged in some concrete fashion in the operation of the aircraft' in order to be liable." *Id*. at 12 (citing *In re Lawrence Inlow*, 2001 WL 331625 at *18.) Plaintiff has made no such allegations here.

Moreover, other allegations in the complaint defeat Plaintiff's argument that a reasonable inference can be drawn that any consent by the owners amounts to control in this case. Thus, Plaintiff alleges that Evans "made the decision to take this abnormal and ultra-hazardous route independently a few minutes after takeoff." (Am. Compl. ¶ 25; *see also* ¶ 19.) Plaintiff therefore asserts that the aircraft was independently controlled by Evans during the activity that caused Plaintiff's injuries. Accordingly, there is no basis by which a plausible claim could be stated that Momentum and XP controlled the aircraft in any manner.

Based on the foregoing, Momentum and XP's motion to dismiss is granted. I also find for the reasons stated in the next section that summary judgment should be granted on the strict liability claim, the only claim asserted against Momentum and XP. Thus, even if their Motion to Dismiss was not granted, they would still be dismissed in connection with the Motion for Summary Judgment.

    B.    <u>CDI Defendants' Motion for Summary Judgment</u>

        1.    <u>Standard of Review</u>

Summary judgment may be granted where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that

there is no genuine issue as to any material fact and the ... moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The burden of showing that no genuine issue of material fact exists is borne by the moving party. *E.E.O.C. v. Horizon/ MS Healthcare Corp.*, 220 F.3d 1184, 1190 (10th Cir. 2000). Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter. *Concrete Works, Inc. v. City & Cnty. of Denver*, 36 F.3d 1513, 1517 (10th Cir. 1994). The nonmoving party may not rest solely on the allegations in the pleadings, but must instead bring forward "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

The court must view the evidence on summary judgment in the light most favorable to the nonmoving party. *Anaya v. Crossroads Managed Care Sys., Inc.*, 195 F.3d 584, 590 (10th Cir. 1999). All doubts must be resolved in favor of the existence of triable issues of fact. *Boren v. Sw. Bell Tel. Co.*, 933 F.2d 891, 892 (10th Cir. 1991).

  2. <u>Analysis</u>

    i. <u>The Strict Liability for Distress Claim Against All Defendants</u>

Both parties agree that this claim asserts strict liability for ultrahazardous or abnormally dangerous activities. *See Minto v. Sprague*, 124 P.3d 881, 884 (Colo. App. 2005). The Restatement (Second) of Torts § 519 describes the liability for ultrahazardous activities, stating that "[o]ne who carries on an abnormally dangerous activity is subject to liability for harm to the person, land or chattels of another resulting from the activity, although he has exercised the utmost care to prevent the harm." *See Minto*, 124 P.3d at 884 (quoting the Restatement). "The liability arises out of the

abnormal danger of the activity itself, and the risk that it creates, of harm to those in the vicinity." Restatement (Second) of Torts, § 519, comment d.  Whether an activity is ultrahazardous, and thus subject to strict liability, is a question of law for the court to decide.  *King v. United States*, 53 F. Supp. 2d 1056, 1076 (D. Colo. 1999), *rev'd in part on other grounds*, 301 F.3d 1270 (10th Cir. 2002).

To determine whether an activity is ultrahazardous or abnormally dangerous, the court must "consider whether: (1) the activity poses a high degree of risk of harm to a person, land, or chattels; (2) it is likely that the resulting harm will be great; (3) the risk cannot be eliminated by exercising reasonable care; (4) the activity is not a matter of common usage; (5) the activity is inappropriate where it occurred; and (6) the activity's value to the community is outweighed by the danger.  *Minto*, 124 P.3d at 884.  These factors all focus on the "activity" being conducted.  *Id.*

Thus, I must determine what the "activity" was in this case.  I note that flying an aircraft is not a *per se* inherently dangerous activity.  *Huddleston by Huddleston v. Union Rural Elec. Ass'n*, 841 P.2d 282 (Colo. 1992) (contract flight service of wintertime mountain flight in a single engine plane was not inherently dangerous activity, even though it crashed).  As noted by one court, "[a]viation is now so commonplace that it cannot be considered to be either inherently dangerous or ultrahazardous." *Little v. McGraw*, 467 S.W.2d 163, 165 (Ark. 1971).

Plaintiff argues, however, that the activity that is subject to scrutiny is not aviation in general but military-style "Close Air Support" ["CAS"] low-altitude, high-speed aviation in a turbo-fan fighter jet in the I-70 corridor.  The evidence does not, however,

necessarily support the assertion that Evans was flying a CAS flight.  (*See* Defs.' Ex. C, Evans Dep. at 153:12-23, 165:22-165:8).  Moreover, Plaintiff has presented no evidence that the ferry flight of the aircraft in question, if conducted in accordance with the Federal Aviation Regulations ["FARs"], is abnormally dangerous or ultrahazardous.  Instead, the activity that Plaintiff has characterized as dangerous is flying the aircraft at a low-altitude, high speed in the I-70 corrider, which ultimately caused the striking of the power lines.  As the CDI Defendants note, this is predicated upon the manner in which the activity was conducted by Evans rather than the activity itself.  The Colorado Court of Appeals has held that liability for ultrahazardous activities "is established by proving the nature of the dangerous product or activity without regard to a defendant's actions. *See Lui v. Barnhart*, 987 P.2d 942, 945 (Colo. App. 1999).  Under this rationale, there is no evidence in the record to support Plaintiff's argument that the activity as Plaintiff characterizes it is ultrahazardous or abnormally dangerous.  Plaintiff asserts that Evans' actions made the flight ultrahazardous, not that the flight itself was ultrahazardous.

Even if Plaintiff is correct, however, and the activity is not merely flying or ferrying the aircraft at issue but the low-altitude, high-speed aviation of the aircraft (an experimental fighter jet) near the I-70 corridor, I still find as a matter of law that this activity is not ultrahazardous.  While some of the factors referenced in *Minto* are met, including that this activity poses a high degree of risk of harm to a person, land, or chattels, I find that the risk of harm in flying the aircraft so low could have been eliminated by exercising reasonable care.  Indeed, Plaintiff's own expert opined that

"[t]he risks of low level flight can be mitigated and greatly reduced by the employment of reasonable care" and also that his "composite opinion of low level high speed flight as an 'ultra-hazardous activity' is that with the proper precautions and control factors utilized, this activity is not inherently ultra-hazardous." (Defs.' Ex. E, McGregor Report, p 18; Pl.'s Ex. 3, McGregor Aff. ¶¶ 11, 15.)

Further, Plaintiff does not allege in his complaint that the risk could not have been eliminated by using reasonable care in operating the aircraft. Rather, Plaintiff maintains that the operation of the aircraft was "not only in violation of multiple FAA regulations, but also plainly outside the realms of normal flying" and "uncommon and illegal." (Am. Compl., ECF No. 98, ¶ 71.) Likewise, Plaintiff alleges in his negligence claim against Evans that a duty of reasonable care was breached and "if Evans and Davoudi did not fly the Vodochody in such a reckless manner, the power lines would never have been struck and those powerlines would never have struck Centofanti's vehicle." (*Id.* ¶ 39.) Taking Plaintiff's own allegations as true, the operation of the aircraft would not appear to be an ultrahazardous activity.

I also note per the Restatement that strict liability for an ultrahazardous activity "is applicable to an activity that is carried on with all reasonable care, and that is of such utility that the risk which is involved in it cannot be regarded as so great or so unreasonable as to make it negligence merely to carry on the activity at all." Restatement (Second) of Torts § 520, Comment a. Here, the activity at question as characterized by Plaintiff certainly does not appear to have been carried on with reasonable care. Evans himself testified and certified in his report to the NTSB that,

-11-

"[t]he most notable safeguard that would have prevented this accident is for the pilot to have not conducted flight at such a low altitude and in such close proximity to powerlines." (Ex. B, NTSB Report at Evans.00144.)  Further, Plaintiff has shown little to no utility in flying an experimental jet plane at high speeds in a low altitude, and the risk which is involved is great and unreasonable.  As noted by one court:

> The theoretical premises for strict liability is that the activity is of such utility to the community that conducting it is not negligence; on the other hand, the activity's commensurate risks cannot be eliminated by the exercise of reasonable or even utmost care.  Therefore, the defendant cannot be excused on the basis of any precautions taken and must pay for any harm he causes.

*Schwartzman v. Atchison, Topeka & Santa Fe Ry. Co.*, 842 F. Supp. 475, 478 (D.N.M. 1993).  The premises for applying strict liability simply do not apply to the activity here.

Plaintiff asserts, however, that Evans testified that there was no way for him to eliminate the risk of a wire strike.  The cited testimony (Pl.'s Ex. 2, Evans Dep. 131:8-21) does not support this assertion.  Evans testified only that he did not think that he was negligent, although he stated "without hesitation" that he was "at fault."  (*Id.*)  Again, however, Evans admitted that the most notable safeguard that would have prevented the accident is for him to have not conducted the flight at such a low altitude and in such close proximity to powerlines.  He also testified that map study could have helped avoid an incursion with a wire.  (*Id.* 167:15-2319.)  Additionally, Evans stated that he would not have hit the power lines if he had complied with all federal aviation guidelines ["FARs"].  (*Id.* 170:7-10.)  And he testified he could have conducted the ferry flight at least 500 feet above the powerlines.  (*Id.* 162:10-163:2.)  Finally, Evans admitted that if

the flight had been conducted in compliance with the FARs, the aircraft would not have had a higher risk of hitting the powerlines than any other aircraft. (*Id.* at 164:14-165:10.)

I also note that other activities which are arguably dangerous, such as the activity as characterized by Plaintiff, have not been recognized as ultrahazardous. *See Walcott v. Total Petroleum, Inc.*, 964 P.2d 609, 615 (Colo. App. 1998) (dispensing of gasoline at a service station); *Forrest v. Imperial Distrib. Servs.,* 712 P.2d 488 (Colo. App. 1985) (delivery of caustic cleaning compound, which "the jury could have reasonably determined" was a "dangerous substance" to dumpsite was not an ultrahazardous activity), *rev'd on other grounds*, 741 P.2d 1251 (Colo. 1987); *Hartford Fire Ins. Co. v. Public Serv. Co.*, 676 P.2d 25 (Colo. App. 1983) (the transmission of natural gas); *cf. Daigle v. Shell Oil Co.*, 972 F.2d 1527, 1545 (10th Cir. 1992) (facts alleged regarding clean-up of toxic lake where Shell stored millions of gallons of liquid hazardous wastes close to a residential neighborhood "may establish that Shell engaged in an ultrahazardous activity).  Indeed, "in Colorado only explosive blasting and impounding of water have been recognized as ultrahazardous activity subject to strict liability." *King*, 53 F. Supp. 2d at 1077.  While this does not necessarily mean that Colorado courts would not expand strict liability to other ultrahazardous activities if appropriate, the rationale for strict liability does not exist here in this case.

Based on the foregoing, I find that the activity in question, even as characterized by Plaintiff, does not constitute as an ultrahazardous activity.  The CDI Defendants' Motion for Summary Judgment is thus granted as to this claim.

### ii. The Respondeat Superior Claim Asserted Against CDI and Tactical Advantage

CDI also argues that it is entitled to summary judgment on the respondeat superior claim. It alleges that Evans was employed by CDI and Tactical Advantage while he was flying the aircraft, that Evans was acting within the scope of his employment, and that CDI and Tactical Advantage are vicariously liable for Plaintiff's damages. (Am. Compl. ¶¶ 84-86.) Tactical Advantage is not a party to the summary judgment motion; thus, I address this claim only as to CDI.

CDI asserts that Evans was an independent contractor and performed the flight solely in that role, citing to the Independent Contractor Agreement, Defendant's Exhibit A. As a matter of law and contract, CDI contends that Evans maintained sole authority for the manner in which the aircraft was operated, and that it cannot be held liable for Evans' independent acts of negligence. In response, Plaintiff asserts that the question of whether Evans was CDI's employee or an independent contractor is a factual one, and the contract between Evans and CDI is not dispositive. I agree.

Under the doctrine of respondeat superior, an employer is liable for the torts committed by an employee or agent while acting within the scope of his or her employment or agency. *Perkins v. Reg'l Transp. Dist.*, 907 P.2d 672, 674 (Colo. App. 1995). As a general rule, a party is not liable for the torts of its independent contractors. *Huddleston v. Union Rural Ass'n*, 841 P.2d 282, 286 (Colo. 1992). "The central element in an employer-employee relationship is the right of the employer to control the details of performance of the employee's duties." *Perkins,* 907 P.2d at 674. However, other

factors are also relevant, such as the right to hire, the payment of salary, and the right to dismiss or terminate employment. *Norton v. Gilman*, 949 P.2d 565, 567 (Colo. 1997). The Restatement (Second) of Agency § 220 lists additional factors such as the kind of occupation and whether the work is usually done under the direction of the employer or by a specialist without supervision; the skill required in the particular occupation; whether the employer or the workman supplies the tools, instrumentalities, and the place of work for the person doing the work; the length of time for which the person is employed; the method of payment, whether by the time or by the job; and whether or not the parties believe they are creating the relation of master and servant.

No one factor is determinative, *Dana's Housekeeping v. Butterfield*, 807 P.2d 1218, 1220 (Colo. App. 1990), and the factors are considered "not as a rigid test" but under "the circumstances of each case." *Norton*, 949 P.2d at 567. The way the parties characterize themselves, whether in an agreement or otherwise, is not dispositive. *Butterfield*, 907 P.2d at 1221.

I find that there are genuine issues of material fact as to whether Evans was an employee or an independent contractor for CDI. Construing the evidence in the light most favorable to Plaintiff, a jury might reasonably infer that Evans was an employee of CDI, even despite the Independent Contractor Agreement. *See Hariss v. Bybee*, 527 P.2d 894, 896 (Colo. App. 1974).

Thus, Plaintiff has shown that CDI supplied instrumentalities of Evans' work, including the aircraft. (Pl.'s Ex. 2, Evans Dep. 56:16-23.) CDI also paid for the fuel used to operate its aircraft, as well as for landing fees, thus paying for the expenses

incurred in operating the aircraft. (*Id.* 56:16-23.)  Further, CDI reimbursed travel expenses and paid Evans a daily rate (rather than a per job basis). (Pl.'s Ex. 1, Huston Dep. 58:3-16.)[3]  Plaintiff has also shown that Evans had special skills in connection with having CAS flight experience, which is required for some of CDI's customers (*id.* 39:21-40:25), and that CDI kept personnel records as to Evans. (*Id.* 90:14-18.)

Plaintiff has also presented evidence that CDI exerted control over the details of its pilots' assignments, including which pilots are offered which jobs, based on their ability and their skills. (Pl.'s Ex. 1, Huston Dep. 59:12-60:8.)  Here, Evans was tasked by CDI with ferrying the aircraft to a specified location for maintenance. (*Id.* 116:12-15; 125:8-15.)  Plaintiff also presented evidence that CDI retains the right to ensure that pilots meet its standards before being chosen for a task, and that it can choose not to use their services again if they do not conform to the standards. (*Id.* 69:20-70:11; 89:11-13.)  Indeed, CDI did not allow Evans to work for the company after the incident in question, because he made a "bad decision", deviating from the flight plan. (*Id.* 131:5-13.)  "The right to discharge someone without liability inherently involves the right to control and is inconsistent with the concept of independent contractor."  *Dana's Housekeeping*, 807 P.2d at 1220.

It is also undisputed that pilots were to report any maintenance status issues with the airplanes.  CDI determines if pilots are adhering to its expectations by having an employee out with the pilot to "kind of watch them and make sure they're doing things right" or, in the case of experienced pilots, having them report to CDI. (Pl.'s Ex. 1,

---

[3] Melissa Emily Huston ["Huston"] testified as the Rule 30(b)(6) representative for CDI.

Huston Dep. 88:12-89:4.) It is also undisputed that CDI required yearly check rides of its pilots. Further, CDI has "standard operating procedures" ["SOPs"] for their pilots. These SOPs relate to day-to-day operations and equipment sign-out, as well as close air support and safety. (*Id.* 92:5-93:12.) While CDI asserts that there is no evidence that SOPs applied to Evans' piloting of the ferry flight or his contract, SOPs arguably applied to other areas of Evans' work. Further, the Independent Contractor Agreement CDI signed with Evans' company, Tactical Advantage, provided standards as to how he should be flying. (Pl.'s Ex. 2, Evans' Dep. 172:16-20; Defs.' Ex. A—Independent Contractor Agreement.)[4]

While CDI relies on Evans' testimony that as the pilot, he was responsible for command of the aircraft, had authority over all aspects of the flight, and was not supervised (Defs.' Ex. C, Evans Dep. 155:10-158-11), this is not dispositive. The New Hampshire Supreme Court found that a master-servant relationship was created between the pilot and owner of a plane where the owner "controlled the destination and told [the pilot] what to do with the plane at conclusion of flight", even though the pilot "had complete possession and control of the plane." *Elwood v. Bolte*, 403 A.2d 869, 871 (N.H. Sup. Ct. 1979). The *Elwood* court also noted that "[t]he fact that the flight provided a benefit to both [the owner] and [the pilot's employer does not destroy the

---

[4] Tactical Advantage is Evans' company that he formed. (Pl.'s Ex. 1, Huston Dep. 30:1-11.) Huston testified that as part of the independent contractor arrangement, CDI contracts with the pilot's business, even though it may be a sole proprietorship with only one person (the pilot) in the company. This is for tax purposes. (*Id.* 30:15-31:3.)

agency relationship, because a servant may simultaneously serve two masters." *Id.* I find this case persuasive.

CDI also asserts, however, that as the undisputable pilot in command of the aircraft, Evans was "directly responsible for" and had "final authority as to, the operation of that aircraft" pursuant to 14 C.F.R. § 91.3, meaning that as a matter of law Evans cannot be held liable for Evans' independent acts of negligence. I find that argument to be unavailing, as it would mean that pilots (or others that control the manner of transportation, such as bus or truck drivers), could never be deemed to be employees. That is inconsistent with the law. *See Perkins*, 907 P.2d at 674 (bus driver was an employee of RTD for purposes of *respondeat superior* liability); *Frank C. Klein & Co., Inc. v. Colo. Comp. Ins. Auth.*, 859 P.2d 323, (Colo. App. 1993) (owner/operator truck drivers were employees, not independent contractors); *DeJean v. United Airlines, Inc.*, 839 P.2d 1153, 1154 (Colo. 1992) (newly hired pilots were employees of United).

Accordingly, the CDI Defendants' Motion for Summary Judgment is denied as to the respondent superior claim.

III. CONCLUSION

Based on the foregoing, it is

ORDERED that Defendants Momentum Foundation, Inc. and XP Services, Inc.'s Fed. R. Civ. P. 12(c) Motion to Dismiss, or in the Alternative, Fed. R. Civ. P. 56 Motion for Summary Judgment filed May 31, 2018 (ECF no. 87) is **GRANTED**, and these Defendants are **DISMISSED**. It is

FURTHER ORDERED that Defendants Coastal Defense, Inc., Momentum Foundation, Inc. and XP Services, Inc.'s Motion for Summary Judgment (ECF No. 50) is **GRANTED IN PART AND DENIED IN PART**. It is **GRANTED** as to the Strict Liability for Distress Claim and **DENIED** as to the respondent superior claim.

Dated: September 26, 2018

BY THE COURT:

s/ Wiley Y. Daniel
Wiley Y. Daniel
Senior United States District Judge